IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| IT XCEL CONSULTING, LLC., | : | Case No. 1:13-cv-67 |
| | : | |
| Plaintiff, | : | Judge Susan J. Dlott |
| | : | |
| v. | : | ORDER GRANTING IN PART AND |
| | : | DENYING IN PART DEFENDANT'S |
| XEROX CORPORATION, | : | MOTION FOR SUMMARY |
| | : | JUDGMENT (Doc. 22) AND DENYING |
| Defendant. | : | PLAINTIFF'S MOTION FOR |
| | : | SUMMARY JUDGMENT (Doc. 30) |

Plaintiff IT Xcel Consulting, LLC ("ITXC") brings this breach of contract action against Defendant Xerox Corporation ("Xerox"). Cross motions for summary judgment are currently before the Court. (Docs. 22, 30.)

For the following reasons, Defendant's Motion for Summary Judgment (Doc. 22) is GRANTED IN PART and DENIED IN PART, and Plaintiff's Motion for Summary Judgment is DENIED. (Doc. 30.)

## I. BACKGROUND[1]

### A. Parties

Xerox is a Fortune 500 document management company that manufactures and sells computer printers, photocopiers, and related consulting services and supplies. Although Xerox markets its products and services through its sales force, it also uses third parties to identify and sell document management products and services to potential corporate clients.

---

[1] Except as otherwise indicated, background facts are drawn from Defendant's proposed Statement of Undisputed Facts (Doc. 23-2) to the extent those facts are admitted in Plaintiff's response thereto (Doc. 55) and Plaintiff's Amended Proposed Statement of Undisputed Facts (Doc. 54) to the extent they are admitted in Defendant's response thereto (Doc. 57).

ITXC is a Hamilton, Ohio company that provides information technology ("IT") services and products. The company was formed in early 2006 by Denny Hollstegge, Doug Shaw, and Mark Hollstegge. Between 1998 and 2006, Denny Hollstegge and Shaw were sales representatives for Xerox Global Services, a subsidiary of Xerox. In mid-2005, Hollstegge and Shaw began discussions about leaving Xerox to form their own company, which would sell the same types of products and services as those they sold as employees of Xerox. Hollstegge and Shaw spent several months negotiating terms of an agreement for ITXC to become business partners with Xerox. These discussions included conversations with Jim Joyce, then-Senior Vice President of Managed Print Services at Xerox, and Jeff Koman and Jeff Bane, both members of Xerox's procurement organization.

### B. The Cleveland Meeting

On December 22, 2005, Denny Hollstegge and Shaw met with Joyce, Koman, and Bane in Cleveland, Ohio. According to Shaw, the parties reached an understanding that starting January 1, 2006, Xerox would pay ITXC commissions in accordance with a model agreed to at the meeting. (Shaw Depo., Doc. 35 at PageID 1259.) On December 28, 2006, Hollstegge sent an email to Koman and Shaw, reflecting the model discussed at the meeting. (*See id.* at Ex. 4.) Amongst other details, the email indicated that the parties discussed ITXC receiving a commission of 1% on Xerox's contract with Fidelity, one of Xerox's customers. (*Id.*)

Joyce and Hollstegge, however, maintain that no agreement was reached at the meeting. (Joyce Depo., Doc. 26 at PageID 575–76; D. Hollstegge Depo., Doc. 37 at PageID 1902.) According to Hollstegge, the notes from the December meeting were a starting point, with a final agreement materializing several months later. (D. Hollstegge Depo. at PageID 1902.)

2

### C. The Xerox Business Partner Master Agreement

On June 9, 2006, Hollstegge and Shaw formally resigned from Xerox. Xerox and ITXC subsequently signed the "Xerox Business Partner Master Agreement" on June 14, 2006. Under the agreement, ITXC acted as a broker or intermediary for Xerox, identifying corporate customers and selling Xerox's business to them. Xerox entered into contracts with the corporate customers identified by ITXC and ITXC provided management services related to those contracts in exchange for commissions.

The Business Partner Agreement included a Sales Referral Addendum, which defined various sales terms. In particular, Schedule 1 to the Addendum defined "Qualified Services" as including Xerox traditional break/fix services. Section 2(c) of the Addendum specifies that commissions on Qualified Services are calculated using the following formula:

> Commission Fee = Service Net Revenue multiplied by (Service Gross Margin Percentage minus 22%)

(*See* Doc. 22-3 at PageID 149.) The section further specified that the service gross margin percentage—the anticipated profit divided by the net revenue from each contract—was to be calculated by Xerox "prior to execution of a Customer Agreement in the pre-deal P/L by specific Customer and Order." (*Id.*) The pre-deal P/L[2] refers to a final profit and loss calculation that was prepared by Xerox in order to project the anticipated costs to be incurred by Xerox and the expected revenue from the customer. (D. Hollstegge Depo. at PageID 1909; Joyce Depo. at PageID 583; Pelham Depo., Doc. 29 at PageID 715.) Although there could be several iterations while a potential deal was being reviewed, only one pre-deal P/L was approved by Xerox before presenting the contract to the customer. (Joyce Depo. at PageID 596–97; Pelham Depo. at

---

[2] The term "pre-deal P/L" was not defined in the Business Partner Agreement.

PageID 715.) If the pre-deal P/L did not yield acceptable profit margins, Xerox would not go forward with the contract. (Joyce Depo. at PageID 583–84, Barbato Depo., Doc. 34 at PageID 400–401.) Based on the formula, Xerox retained the first 22% of the anticipated profit generated from the service contract each month.[3]

### D. Fidelity Print Services Contract

In October 2003, Xerox reached an agreement with Fidelity to manage its print services at various locations throughout the country. The Fidelity contract remained in place after ITXC was formed.

In July 2006, ITXC received its first commission statement from Xerox after the Business Partner Agreement was signed. The statement reflected a commission payment of 1% with a budgeted gross margin of 22.19%. (*See* D. Hollstegge Decl., Doc. 49-1 at PageID 2535–36). Hollstegge—who believed Xerox was trying to pay ITXC based on the actual monthly profit numbers versus the profit percentage in the pre-deal P/L—contacted Jeff Koman to protest the 1% commission rate. (*Id.*) Koman indicated that "[a]lthough the monthly GM, which commissions are to be based upon is 22.19%[,] I will honor the 1% commission payout that was committed during [the] December 22nd meeting." (Doc. 49-1, at PageID 2539.) According to Hollstegge, Koman told him that ITXC could present his argument to Xerox senior management, but that Xerox would likely cancel the contract immediately. (D. Hollstegge Decl. at PageID 2536.) Concerned that Xerox would terminate the agreement, ITXC did not pursue the issue further at that time. (*Id.*) From July 2006 through December 31, 2008, Xerox paid ITXC a commission of 1% of the monthly net service revenue from Fidelity.

---

[3] For example, if the pre-deal L/P was 30%, ITXC would be paid a commission of 8% of the net revenue (30% - 22%). (*See* Doc. 30, PageID 751.)

### E. Amended and Restated Business Partner Master Agreement

On October 31, 2006, Jeff Bane advised ITXC that Xerox was cancelling the Business Partner Agreement and wanted to renegotiate terms. The parties then signed three extensions to allow Xerox additional time before eventually executing the "Amended and Restated Xerox Business Partner Master Agreement" on April 27, 2007. (*See* Amended and Restated Xerox Business Partner Master Agreement, Doc. 22-9 at PageID 166.) The Amended Master Agreement did not alter Section 2(c)'s commission formula for qualified services.

### F. Federated/Macy's Hardware Contract

As part of the Amended and Restated Xerox Business Partner Master Agreement, Section 2(a) of Schedule 1 was modified to provide a bonus to ITXC for additional hardware sales made to Macy's. The following language was added to the Sales Referral Addendum, setting the bonus threshold at a product net revenue of $770,000:

> Notwithstanding the foregoing, if the aggregate Product Net Revenue for calendar year 2007 under all Customer Agreements between Xerox and Federated (as defined in Schedule 2 to the Addendum) exceeds $770,000, then the applicable Commission Fee calculated under this Section 2(a) with respect to Federated shall equal 50% of the applicable Product Gross Margin, in the aggregate. On a quarterly basis during 2007, Xerox shall determine if the aggregate Product Net Revenue to date under such Customer Agreements exceeds the $770,000 threshold. If such threshold is met, Xerox shall pay Xerox Business Partner the incremental amount of Commission Fees to which Xerox Business Partner is entitled under this paragraph taking into account any Commission Fees previously paid to Xerox Business Partner for calendar year 2007.

(*See* Doc. 22-9 at PageID 174.) In other words, the addendum provision provided that ITXC was entitled to a bonus if the aggregate product revenue for the contract exceeded $770,000. ITXC met the bonus threshold and requested payment per the bonus after the second quarter of 2007. (Hollstegge Decl. ¶15.) However, Xerox refused to pay the bonus. (*Id.*) Xerox claimed the

5

$770,000 threshold for Product Net Revenue was a drafting mistake—that the threshold should have been set at a *profit* of $770,000, not revenue.

In December of 2007, Xerox amended the contract to address the alleged drafting error in the April 2007 amendment, setting the bonus threshold at a product net revenue of $14,000,000 in 2008. (*See* Doc. 22-24 at PageID 341.) No bonus commissions were paid by Xerox in 2007 pursuant to the bonus provision.

### G. Federated/Macy's Maintenance Contract

On November 20 2007, Macy's and Xerox entered into a one-year extension of a maintenance service agreement that predated the formation of ITXC. (*See* Shaw Dep., Ex. 105 at PageID 1377.) The service agreement extension extended the terms of the original December 19, 2005 agreement for a one year period, from December 20, 2007 to December 19, 2008. Prior to the extension, between July 2006 and January 2008, Xerox paid ITXC commissions based on a service margin or budgeted gross margin of 42.5% for laptops and 25.88% for LAN/data equipment. (Mark Hollstegge Depo, Doc. 32 at PageID 1091.)

On January 24, 2008, Jeff Bane notified ITXC that the Macy's/Federated service contract was operating significantly below the 22% gross margin level specified by 2(c) of the Sales Referral Addendum. According to Xerox, the profit margins were in the 8% to 10% range. (Doc. 22-22, Exhibit 21 at PageID 337.) When ITXC received its January 2008 commissions statement it included no commissions for the Macy's maintenance contract and the word "done" was printed in the margin. Xerox did not pay ITXC any commissions for the contract in 2008.

In September 2008, Xerox gave notice per the terms of the Amended Master Agreement that it would terminate the agreement effective December 31, 2008. ITXC continued to do business with Xerox on other matters.

### H. The Pre-Deal P/L for the Fidelity Contract

Hollstegge states that he wished to review the pre-deal P/L that Xerox approved for the Fidelity contract before approaching Xerox regarding their contract disputes. (Hollstegge Dep. at PageID 1896–97.) In July 2012, Hollstegge contacted Tommy Pelham—the administrator of the Fidelity contract for Xerox—and requested the "approved Pre-Deal P/L" for the Fidelity contract. Although Pelham testified that he does not know whether the document is an approved pre-deal P/L, Pelham provided Hollstegge with an Excel spreadsheet reflecting a labor margin of 38.2% in the "P and L" tab. (Pelham Depo., Doc. 29 at PageID 717, Ex. 2. at PageID 736-37.)

### I. PLAINTIFF'S COMPLAINT

Based on the above facts, ITXC brings three distinct breach of contract claims. First, Plaintiff claims Xerox breached their agreement in relation to the Federated/Macy's hardware bonus. Plaintiff claims that it exceeded yearly gross revenues of $770,000 on the Federated contract in 2007. Under Section 2(a) of the Sales Referral Addendum, ITXC claims Xerox agreed to pay it a commission equal to 50% of the applicable gross margin if the yearly revenue target was met, but failed to do so. Plaintiff seeks damages of $198,985.28 on this claim.

Second, with regard to the Fidelity contract, ITXC claims that Xerox failed to pay commissions according to the formula set forth in Section 2(c) of Schedule 1 to the Sales Referral Addendum. Plaintiff maintains that the pre-deal P/L for the Fidelity contract was 38.2%

and that ITXC should have been paid commissions of 16.2% of the monthly net revenue from services instead of the 1% it received. Plaintiff seeks damages of $1,218,149.60 on this claim.

In its third and final claim, Plaintiff argues that Xerox also failed to comply with Section 2(c) of the Sales Referral Addendum on the Federated/Macy's maintenance contract. According to Plaintiff, Xerox simply stopped paying ITXC commissions because the maintenance contract was not as profitable as Xerox projected. Plaintiff contends that under their agreement, the contract's current profitability is not relevant to the commissions calculation, which is assessed based upon the pre-deal P/L or budgeted gross margin. Based on Xerox's monthly commission statements showing the budgeted gross margin to be 42.5% and 25.88% for laptops and LAN/data services, respectively, Plaintiff claims it is entitled to unpaid commissions of approximately $290,000.

## J. MOTIONS FOR SUMMARY JUDGMENT

Xerox and ITXC have both filed Motions for Summary Judgment. For the reasons that follow, the Court finds that Xerox is entitled to summary judgment on Plaintiff's Federated/Macy's hardware contract claim. However, because genuine disputes of fact exist on the remaining claims, the Court will deny both parties' motions as to these claims.

### A. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). All reasonable inferences from the record must be drawn in the light most favorable to the nonmoving party, and the court may grant summary judgment only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec.*

*Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986). The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). The task of the Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.

### B. Federated/Macy's Hardware Contract Claim

Plaintiff moves for summary judgment on its claim that Xerox failed to pay bonus commissions due under the Federated/Macy's hardware contract. As noted above, the April 27, 2007 amendment to the Sales Referral Addendum stated that ITXC would receive a bonus commission if it met a yearly revenue target of $770,000. Defendant opposes Plaintiff's motion and moves for summary judgment on the ground that the $770,000 revenue threshold was a drafting error and contrary to the intent of the parties. The uncontroverted evidence, Defendant claims, establishes that the $770,000 figure was in reference to profit, not revenue.

Plaintiff does not dispute Xerox's claim that a mistake was made in drafting the bonus provision in the Sales Referral Addendum. However, it claims that it is entitled to summary judgment because when Xerox revised the language in the December 2007 amendment, the language was prospective only and expressly referred to the new bonus formula applicable to the

9

2008 calendar year. Plaintiff maintains that this resulted in a "technical breach" because ITXC met the $770,000 revenue threshold in 2007 but did not receive a commission bonus.

Under New York law—which governs the contract in this case—"a contract is to be construed in accordance with the parties' intent, which is generally discerned from the four corners of the document itself." *MHR Capital Partners LP v. Presstek, Inc.*, 912 N.E.2d 43, 47 (N.Y. 2009). However, "[s]ince the intent of the parties in entering an agreement is a paramount consideration when considering a contract, even the actual words provided therein may be transplanted, supplied or entirely rejected to clarify the meaning of the contract." *Reape v. New York News, Inc.*, 504 N.Y.S.2d 469, 470 (App. Div. 1986) (citing *Castellano v. State of New York*, 374 N.E.2d 618 (N.Y. 1978)). "Where there is no mistake about the agreement, and the only mistake alleged is in the reduction of that agreement to writing, such mistake of the scrivener, or of either party, no matter how it occurred, may be corrected." *Hart v. Blabey*, 39 N.E.2d 230, 232 (N.Y. 1942). "Reformation is not granted for the purpose of alleviating a hard or oppressive bargain, but rather to restate the intended terms of an agreement when the writing that memorializes that agreement is at variance with the intent of both parties." *George Backer Mgmt. Corp. v. Acme Quilting Co.,* 46 N.Y.2d 211, 219 (N.Y. 1978). A party seeking reformation must show "in no uncertain terms, not only that mistake or fraud exists, but exactly what was really agreed upon between the parties." *Id.*

Xerox points to the testimony of individuals associated with both Xerox and ITXC in support of its claim that the $770,000 revenue threshold was a mistake and contrary to the intent of the parties. Marcelle Gress, Manager for Xerox's supplies organization, stated that the $770,000 figure was intended to be the gross margin, with a revenue target of $14 million.

10

Consistent with her statement, in a December 12, 2007 email discussing the "minimal" changes needed to be incorporated into the 2008 contract renewal, Gress noted:

> In the Schedule 1 to Sales Referral Addendum section, a correction is needed on page 2. In the paragraph that begins "Notwithstanding the foregoing, if the aggregate Product Net Revenue for the calendar year ….." As described in the contract the word "revenue" should be "gross profit" in all instances. The intent of this section was that the revenue target for Federated in 2007 was $14M with a 5.5% GM which is $770,000.

(Doc. 22-10, Ex. 9 at PageID 178.)

Jeff Bane, who was responsible for Xerox's document services contracts with Macy's, similarly asserts that the figure was an error. Bane states that in order to provide ITXC with an incentive to grow its hardware sales to Macy's, the baseline target for sales was $14 million revenue with a 5.5% gross margin, with a resulting gross profit of $770,000. (Bane Decl., Doc. 22-11 at PageID 181, Bane Depo., Doc.) Bane's declaration is supported by an April 27, 2007 email seeking approval of the 2007 amended Xerox Business Partner agreement. Therein, Bane describes the changes in the amended agreement, including the desire to "provide compensation for incremental business beyond the baseline target. This plan is as follows: baseline target for Federated in 2007 will be $14M with a 5.5% GM. Incremental revenue and associated GP will be split 50/50 between XGS and ITXC with quarterly payouts." (*Id.* at Exhibit A, PageID 183.) Xerox's Senior Vice President Tom Barbato also testified that the $770,000 revenue threshold was in error. (Barbato Depo., Doc. 24 at PageID 391.)

Doug Shaw, a founding member of ITXC, testified that the revenue threshold was intended as an incentive for ITXC to increase hardware sales revenue. (Shaw Depo., Doc. 35 at PageID 1284.) However, Shaw stated that in 2007 and 2008, the product net revenue for hardware sales to Macy's always exceeded one million dollars, and was closer to fourteen

11

million dollars. In other words, a $770,000 revenue target would amount to a *decrease* in hardware sales. Shaw's testimony therefore indicates that the $770,000 revenue threshold is inconsistent with the intent that Section 2(a) provide ITXC with an incentive to increase sales. Furthermore, a net revenue of fourteen million—an achievable goal according to Shaw—would yield in between $700,000 and $800,000 in profit,[4] further indicating that the $770,000 threshold was intended to be the profit corresponding to the $14 million revenue target. (*Id.* at 199-200).

Based on the above evidence, the Court concludes that Defendant has met its burden to demonstrate that the revenue threshold was a mistake and contrary to the intent that the provision incentivize ITXC's hardware sales. Particularly in this case, where Plaintiff does not contest that the contract language was the result of a drafting error or claim the revenue threshold is consistent with the parties' negotiations or intent, the Court finds summary judgment appropriate. The Court will therefore grant Defendant's Motion for Summary Judgment and deny Plaintiff's Motion for Summary Judgment with respect to the Federated/Macy's hardware contract claim.

## C. Fidelity Contract Claim

Next, both parties move for summary judgment on Plaintiff's claim that Xerox failed to pay the proper commission on the Fidelity contract. Plaintiff maintains that pre-deal P/L applicable to the Fidelity contract was 38.2%, resulting in commissions of 16.2% of the monthly service revenue, instead of the 1% it was paid. ITXC argues that Xerox has failed to produce any documentation in support of the 22.19% figure it claims to be the pre-deal P/L and that

---

[4] By contrast, Shaw stated that $770,000 of revenue would net approximately $40,000 in profit. (*Id.* at 205-206.)

substantial and consistent documentation demonstrates the applicable percentage for the Fidelity contract was at least 38%.

Defendant disputes the significance of the 38.2% figure. According to Xerox, it is entitled to summary judgment because no pre-deal P/L specifying a 38.2% Service Gross Margin for the Fidelity exists. Xerox further contends that the parties agreed to a 1% commission rate at the December 22, 2006 Cleveland meeting. Finally, Xerox claims that Plaintiff has waived any claims it had to additional commissions by accepting the commissions it was paid.

Whether the 38.2% reflected in the spreadsheet and other documents underlying Plaintiff's claim is the pre-deal P/L for the Fidelity contract is a disputed issue of material fact. Plaintiff has proffered evidence that the spreadsheet containing the 38.2% figure was provided on its request for the "approved Pre-Deal P/L" for the Fidelity contract and that the document is consistent with the deal review analysis requiring approval by a high level manager prior to the contract being presented to the customer. (Dean Decl., Doc. 30-14 at PageID 1052.) Plaintiff also cites to additional documents which it claims demonstrates that Xerox expected a profit of 38% prior to signing the Fidelity contract. (*See* Doc. 45 at PageID 2357.)

Defendant has offered conflicting evidence in support of its position that the 38.2% figure is not the applicable pre-deal P/L. Specifically, Defendant cites testimony that the spreadsheet is a cost model (as opposed to a P/L sheet) and that the 38.2% figure is only a gross profit margin on the labor services under the Fidelity contract (which also included hardware sales).[5] (Pelham Decl. Doc. 22-2 at PageID 128-29.) It is not the task of the Court to weigh this conflicting

---

[5] Plaintiff counters with the Denny Hollstegge's testimony that a "cost model" and a "pre-deal P&L" are synonymous, as they both represent the expected cost and profit expectations before an agreement/contract is presented to a customer. (Hollstegge Supp. Decl., Doc. 45-1 at PageID 2372.) Plaintiff further contends that the Fidelity contract demonstrates that hardware and supplies were billed separately from the service cost model. (*Id.*)

evidence. Rather, the Court must determine if a genuine issue exists for trial. In this case, the Court concludes that whether 38.2% is in fact the pre-deal P/L upon which the Fidelity commissions should have been calculated presents a genuine issue of material fact, precluding an award of summary judgment.

Defendant nevertheless claims that it is entitled to summary judgment on the alternate basis that the parties agreed to the 1% commission rate at the December 22, 2005 Cleveland meeting. However, whether the parties reached an agreement at the meeting is itself a disputed issue of fact. As noted above, the record contains conflicting testimony as to whether an agreement was reached. As such, Xerox is not entitled to summary judgment on this basis.

Finally, summary judgment is not warranted on Xerox's argument that Plaintiff waived its claim for additional commission by accepting lower commissions. Although Defendant correctly notes that contractual rights may be waived if they are knowingly, voluntarily and intentionally abandoned, under New York law it is "well-settled that a party to an agreement who believes it has been breached may elect to continue to perform the agreement rather than terminate it, and later sue for breach; this is true, however, only where notice of the breach has been given to the other side." *National Westminster Bank v. Ross*, 130 B.R. 656, 657 (S.D. New York 1991). *See also Capital Medical Systems, Inc. v. Fuji Medical Systems,* 658 N.Y.S.2d 475, 478 (App. Div. 1997) (finding that the plaintiff did not waive right to additional commissions based on acceptance of lower commission rate, where the plaintiff complained that it was not receiving the commission to which it was entitled). In this case, evidence in the record demonstrates that Hollstegge protested the 1% commission rate upon receiving Plaintiff's

14

commission statement. (*See* D. Hollstegge Decl., Doc. 49-1 at PageID 2535–36.) Thus, Plaintiff did not waive this claim and Xerox is not entitled to summary judgment on this basis.

Having found that genuine issues of material fact preclude granting summary judgment on Plaintiff's Fidelity contract claim, the Court will deny Plaintiff's and Defendant's Motions for Summary Judgment as to this claim.

### D. Federated/Macy's Maintenance Contract Claim

In its final claim, Plaintiff contends that Xerox breached the Business Partner Agreement by terminating ITXC's commission payments on the Macy's maintenance contract. Specifically, Plaintiff claims that Xerox violated Section 2(c)'s specification that commissions are calculated based on the pre-deal P/L determined prior to the execution of a customer agreement. On January 28, 2007, roughly two months after Macy's and Xerox executed the November 20, 2007 service agreement extension, Jeff Bane informed ITXC that because "we are currently operating significantly below the 22% gross margin level," Xerox would cease payment of commissions to ITXC under the extended agreement. (Bane Decl., Doc. 22-11 at PageID 181, 185.)

Plaintiff contends that the actual profitability of the contract is irrelevant to the commission calculation and therefore did not provide Xerox with a basis for terminating its commission payments. According to Plaintiff, Xerox specifically negotiated to use the pre-deal P/L percentage to calculate service commissions instead of the actual P/L percentage, which Xerox would need to review each month to determine ITXC's commissions. (D. Hollstegge Depo. at PageID 1903, 1909.) While the actual P/L percentage could fluctuate each month, the pre-deal P/L was the expected profit percentage for the length of the contract. (*Id.*) Plaintiff

15

therefore claims that Xerox breached their agreement by terminating ITXC's commissions because the contract was operating at a lower profit than Xerox predicted.

Xerox contends that the uncontested evidence establishes that the profit and loss figures prior to the service agreement extension (the "pre-deal P/L" as Defendant sees it) demonstrates that the gross margin was below 22%. Xerox employee Marcelle Gress, for example, asserts that P/L figures from as far back as 2006 indicated that Xerox was in a negative position in terms of gross margin as it related to ITXC's commission on the contract. (Gress Depo. at PageID 507–508.) Bane further states that the gross margin reflected in the profit and loss statements prepared prior to the service agreement extension was well below the 22% gross margin threshold for ITXC to receive a commission. (Bane Decl. at PageID 181-82 ¶ 6.)

Plaintiff, in response, disputes the data from prior to the service agreement extension, noting that Xerox has not produced a pre-deal P/L or supporting documentation showing a lower expected profit margin. (*See* D. Hollstegge Depo. at PageID 1928.) Plaintiff further contends that Xerox failed to comply with the mechanism set forth in Section 2(c) of the agreement for changing the pre-deal P&L. According to Plaintiff, Xerox was required to obtain a project change request (PCR) and calculate the gross margin based on a "blend of the original P/L and the P/L relating to such PCR." (*See* Doc. 22-9 at PageID 175.) Plaintiff argues that the only produced PCR relating to the maintenance contract reflects an extension of the Macy's service contract with expected additional revenue of $4.1 million. (Barbato Depo. at Ex. 4, PageID 438.) The record also includes a November 20, 2007 "Services Deal Review – Solution Validation Form (SVF)" regarding the Macy's maintenance contract renewal. The form states that "[p]ricing and profitability, margins meet business requirements or appropriate exceptions

16

are attached." (*Id.* at PageID 398–400.)  The document does not include any attached exceptions.  (*Id.* at 400.)

The Court has reviewed the pleadings and attached exhibits and finds that neither party has carried its burden to demonstrate it is entitled to summary judgment.  Material questions of fact—including whether Xerox terminated the contract based on its current profitability or whether Xerox's failure to pay commissions followed a profit and loss analysis conducted prior to renewing the Macy's contract—preclude an entry of summary judgment for either party.  Accordingly, the Court hereby denies Plaintiff's and Defendant's Motions for Summary Judgment with respect to the Macy's maintenance claim.

K.  **CONCLUSION**

For the foregoing reasons, Plaintiff's Motion for Summary Judgment (Doc. 30) is DENIED.  Defendant's Motion for Summary Judgment (Doc. 22) is GRANTED as to Plaintiff's Federated/Macy's hardware contract claim and DENIED in all other respects.

**IT IS SO ORDERED.**

\

S/Susan J. Dlott
Judge Susan J. Dlott
United States District Court